SECOND DIVISION

DECEMBER 06, 2005 

No. 1-04-0444

TERRI BRAX, as Parent and Next Friend )

of Jonathan Brax, a Minor, ) Appeal from the

) Circuit Court of

Plaintiff-Appellant, ) Cook County. )

v. ) No. 97 L 3143

)

MICHAEL KENNEDY, and SURGICAL ) 

SPECIALISTS, LTD., a Corporation, ) The Honorable

) Carol P. McCarthy,

Defendants-Appellees. ) Judge Presiding.

PRESIDING JUSTICE GARCIA delivered the opinion of the court.

On March 17, 1997, the plaintiff, Terri Brax, as the mother and next friend of minor Jonathon Brax (Jonathon), filed a complaint against the defendants, Michael Kennedy, M.D. (Dr. Kennedy), and Surgical Specialists, Ltd.  The plaintiff's complaint alleged negligence against both defendants (counts I and III), and sought expenses from both defendants pursuant to section 15 of the Rights of Married Persons Act (750 ILCS 65/15 (West 2002)) (counts II and IV).    

On March 5, 2003, a jury returned a verdict in favor of the defendants.  The plaintiff appeals, arguing the trial court erred when it (1) instructed the jury using the long form of Illinois Pattern Jury Instructions, Civil, No. 12.05 (1995), (hereinafter IPI Civil (1995), No. 12.05); (2) failed to instruct the jury as to increased risk of future harm; and (3) allowed Dr. Kennedy to provide an undisclosed opinion in violation of Supreme Court Rule 213 (see Official Reports Advance Sheet No. 8 (April 17, 2002)).  We affirm the judgment below. 

BACKGROUND

On August 21, 1995, Jonathon began to feel sick with complaints of a sore throat and stomach pain.  Over the course of the next 24 hours, he suffered from nausea and vomiting and his abdominal pain worsened.  

On August 22, Mrs. Brax took Jonathon to Northwest Community Hospital's Urgent Care Center (Northwest) in Schaumburg, Illinois.  At Northwest, Jonathon was treated by Dr. Bijan Farah, a board-certified emergency room physician.  Dr. Farah diagnosed Jonathon with appendicitis
(footnote: 1).  Following his diagnosis, Dr. Farah spoke with Jonathon's pediatrician and coordinated with Dr. Kennedy to transfer Jonathon to the Hoffman Estates Medical Center (Hoffman Medical) for a surgical consultation.

At Hoffman Medical, Dr. Kennedy examined Jonathon in the emergency room.  Dr. Kennedy found Jonathon had a soft abdomen, with tenderness in the right-lower quadrant, a sign of appendicitis.  Dr. Kennedy also interviewed Mrs. Brax and Jonathon to get an accurate picture of Jonathon's symptoms.  Dr. Kennedy was made aware Jonathon suffered from nausea, vomiting, severe abdominal pain, poor appetite, and fever.  However, Jonathon's complaints of abdominal pain lessened while being examined by Dr. Kennedy.  Tests revealed that Jonathon had an elevated white blood cell count of 180,000.  In Dr. Kennedy's experience with appendicitis, the white blood cell count typically ranges from 10,000 to 15,000, while a more elevated white blood cell count did not provide for a specific diagnosis.  Based on Jonathon's symptoms, Dr. Kennedy determined that Jonathon was suffering either from gastroenteritis
(footnote: 2) or from acute appendicitis.  Dr. Kennedy specifically noted that Jonathon's vomiting and nausea, prior to his abdominal pain, led him to lean toward a diagnosis of gastroenteritis.   

To determine the cause of Jonathon's symptoms, Dr. Kennedy ordered a lower GI series
(footnote: 3), which included a barium enema.  In his deposition, Dr. Kennedy described a barium enema as a radiographic contrast study wherein contrast is introduced through a small rubber catheter inserted through the anus and into the rectum.  The contrast goes around the entire length of the colon to the right side of the lower abdominal region, to the appendix.  Dr. Kennedy testified that with a barium enema, there are three findings that suggest appendicitis: (1) non-visualization of the appendix, (2) inflammatory change on the cecum
(footnote: 4), and (3) irritation and displacement of the surrounding small intestinal loops.  Dr. Kennedy relied on the lower GI series to rule out appendicitis as the cause of Jonathon's abdominal pain.  

Dr. Timothy Tully, a radiologist, interpreted the results of the barium enema in real time, as the contrast was filling Jonathon's abdomen, and in photographs taken of the process.  Although the appendix could not be seen in the photographs taken of the barium study, Dr. Tully was able to visualize the entire appendix during the procedure.  Dr. Kennedy received Dr. Tully's report, which indicated that the colon had filled with barium and the appendix appeared normal.   

Based upon the normal barium study and Jonathon's decreased pain, Dr. Kennedy sent Jonathon home with his parents, who were advised to return with him to the hospital if his symptoms worsened.  

On August 23, 1995, Mrs. Brax called Jonathon's pediatrician's office and spoke with Dr. Greg Gorski.  Mrs. Brax told Dr. Gorski that Jonathon had developed diarrhea.  Dr. Gorski spoke with Dr. Kennedy and then told Mrs. Brax that Jonathon had the flu.

On August 24, 1995, Mrs. Brax again called Jonathon's  pediatrician's office, spoke with Dr. Lori Sielski, and took Jonathon in for a consultation.  Dr. Sielski examined Jonathon and found he had abdominal pain and was toxic looking.  Dr. Sielski believed Jonathon had a ruptured appendix and was suffering from dehydration.  Dr. Sielski planned to admit Jonathon to the hospital, give him antibiotics, and get a surgical consultation.  Dr. Sielski spoke with Dr. Kennedy, who agreed with the plan, examined Jonathon, found abdominal pain, and ordered a CT scan
(footnote: 5) of Jonathon's abdomen, which conclusively demonstrated that Jonathon's appendix had ruptured. 

Following the CT scan, Dr. Kennedy performed surgery on Jonathon.  Jonathon did not recover as expected and was transferred to Children's Memorial Hospital, where he was seen by Dr. Grant Geissler.  During surgery, Dr. Geissler discovered that Jonathon suffered from a malrotation
(footnote: 6) of the bowel and had developed a mid-gut volvulus.
(footnote: 7)  

On March 17, 1997, a medical malpractice complaint was filed against Dr. Kennedy and Surgical Specialists, Ltd., alleging that Dr. Kennedy had deviated from the standard of care in his treatment of Jonathon and that the alleged negligence was the proximate cause of Jonathon's injuries.  

It was plaintiff's position at trial that Dr. Kennedy was negligent in not diagnosing Jonathon with appendicitis on August 22, 1995.  Specifically, the plaintiff contended that Dr. Kennedy should have performed a CT scan on Jonathon on August 22, 1995.  The plaintiff surmised that as a result of Dr. Kennedy's negligence, Jonathon developed a mid-gut volvulus and required subsequent surgeries.  

During their opening statement, the defendants contended that (1) Jonathon's conditions met the criteria of both appendicitis and gastroenteritis; (2) Dr. Kennedy reasonably relied on the barium study, which showed no evidence of appendicitis; and (3) Jonathon's malrotation was a congenital condition, regarding which there was no testimony that Dr. Kennedy should have known about or suspected, and the malrotation caused the mid-gut volvulus, which later surgeries were required to repair.

The plaintiff's medical expert, Dr. Jon Morris, and the defendants' medical expert, Dr. Barry Newman, disagreed regarding whether Dr. Kennedy adhered to the standard of care by sending Jonathon home with his parents on August 22.  There was also disagreement regarding whether Dr. Kennedy should have administered a barium enema on August 22 or should have ordered a CT scan.  There was further disagreement regarding when Jonathon's appendix ruptured and whether that rupture contributed to Jonathon's mid-gut volvulus.  

On March 5, 2003, the jury returned a general verdict in favor of Dr. Kennedy and Surgical Specialists, Ltd.  The instant appeal followed.  Additional pertinent facts will be discussed in the context of the issues raised in this appeal.          

ANALYSIS

I. Sole Proximate Cause Instruction

The plaintiff first complains that the trial court abused its discretion in refusing to give the short form of Illinois Pattern Jury Instructions, Civil, No. 12.04 (hereinafter IPI Civil (1995) No. 12.04).  The plaintiff specifically contends, "[i]n the present case, there was evidence of several contributing causes to Jonathon's injuries, but there was no evidence of any outside person or thing that was the 
only
 cause."  (Emphasis in original.)  The plaintiff argues that there was evidence from which the jury could infer that Jonathon's parents contributed to his injuries or that Dr. Tully incorrectly read the barium enema study he performed on Jonathon. 

The defendants contend that throughout trial they presented the theory that Jonathon's mid-gut volvulus was the result of a preexisting congenital condition of malrotation, and not any negligence on Dr. Kennedy's part or on the part of any other person.  

At the initial jury instruction conference, the plaintiff tendered the short form of IPI Civil (1995) No. 12.04, which stated:

"More than one person may be to blame for causing an injury.  If you decide that a defendant was negligent and that his negligence was a proximate cause of injury to the plaintiff, it is not a defense that some third person who is not a party to the suit may also have been to blame."  IPI Civil (1995) No. 12.04.

In arguing for the proposed jury instruction, the plaintiff's attorney stated, "there is evidence in this case from which the jury might infer that someone other than the defendant might have done something wrong, and there's no evidence that anyone other than the defendant could be a sole proximate cause."  The trial court countered, "I think there was a suggestion off of the record that the parents might be blamed somehow here; but I don't think that anybody is adopting that position."  The plaintiff's attorney agreed, but stated, "I'm not necessarily worried about it directly.  But there's already evidence out there.  The jury could be thinking, well, they were told to bring him back."  The trial court then emphasized that Jonathon's parents did, in fact, bring him back to the hospital when his condition worsened; "and all the doctors testified that the parents did absolutely nothing wrong here. *** And so, there really isn't any evidence in the record to suggest - unless it's another doctor here, I think.  I just assumed that you were going to try to put this on Dr. Tully or something.  I don't know, but it doesn't appear to be the case.  So the instruction that I tend to think is more appropriate is [IPI Civil (1995) No.] 12.05."  

The parties then discussed the instruction tendered by the defendants, the long form of IPI Civil (1995) No. 12.05, which states:

"If you decide that a defendant was negligent and that their negligence was a proximate cause of injury to the plaintiff, it is not a defense that something else may  also have been a cause of the injury.

However, if you decide that the sole proximate cause of the injury to the plaintiff was something other than the conduct of the defendant, then your verdict should be for the defendant."  IPI Civil (1995) No. 12.05.

The trial court noted that the plaintiff's attorney had a strong objection to the proposed instruction and invited his argument.  The plaintiff's attorney began by noting that "[t]he long form is designed for when there's specific evidence of a specific cause or instrumentality or person *** other than the defendant's negligence."  The defendants' attorney responded that "there is ample evidence, and it's part of our defense that the patient's condition of appendicitis *** and the pre-existing congenital condition of the malrotation and the volvulus which flowed therefrom was the sole cause of all the damages to Jonathon Brax."  The plaintiff's attorney responded that "the volvulus is only one part of Jonathon's injuries. And I believe instructing the jury with the long form would tell them that if they believe that the volvulus is not related to the negligence, then they should find for the defendant without considering these other aspects of the injury."  The trial court concluded that although it was reserving ruling on the issue, the long form of IPI Civil (1995) No. 12.05 allowed the jury "to either conclude that *** the harm was a result of a congenital birth defect that had nothing to do with negligence, or in the alternative that there is no sole proximate cause to this [and] the doctor contributed to the injury."  

The plaintiff's attorney then made a "conditional tender."  "If the [trial] Court is inclined to give [IPI Civil (1995) No.] 12.05 the long form, then I would tender the first paragraph to say, 'it is not a defense that something or someone else may have also been a cause of the injury.'"  The proposed jury instruction was described as an "[IPI Civil (1995) No.] 12.04 hybrid with [IPI Civil (1995) No.] 12.05." 

The trial court found that there was sufficient evidence for the jury to properly consider that something or someone other than Dr. Kennedy may have been the sole proximate cause of Jonathon's problems following the surgical removal of his appendix.  As a result, the trial court subsequently ruled that it would give the hybrid, long-form version of IPI Civil (1995) No. 12.05, as proposed by the plaintiff.  

The plaintiff now contends the giving of this instruction instead of IPI Civil (1995) No. 12.04 was error.

We need not address this specific contention because the trial court issued the hybrid jury instruction at the behest of the plaintiff.  See 
McMath v. Katholi
, 191 Ill. 2d 251, 730 N.E.2d 1 (2000). "'It is fundamental to our adversarial process that a party waives his right to complain of an error where to do so is inconsistent with the position taken by the party in an earlier court proceeding.'"  
McMath
, 191 Ill. 2d at 255, quoting 
Auton v. Logan Landfill, Inc.
, 105 Ill. 2d 537, 543, 475 N.E.2d 817 (1984).  Moreover, a party cannot complain of an error which it induced the trial court to make or to which he consented.  
McMath
, 191 Ill. 2d at 255.  "Waiver is particularly pertinent where the conduct of a party before the trial court induced the court to rule as it did."  
People v. McAdrian
, 52 Ill. 2d 250, 254, 287 N.E.2d 688 (1972).

As clearly set forth in the transcript quoted above, at the conference on the proposed jury instructions the trial court commented on the plaintiff's reasons for promoting the short form of IPI Civil (1995) No. 12.04.  Specifically, the trial court stated that there was no merit to plaintiff's assertion that the jury might blame (1) Jonathon's parents, as all the experts testified that the parents were not at fault and had acted in accordance with Dr. Kennedy's instructions, that is, they returned Jonathon to the hospital when his condition worsened; or (2) Dr. Tully, for misreading the barium report, as Dr. Kennedy asserted that he and Dr. Tully were within the standard of care in using the barium enema to discern whether Jonathon had appendicitis.  

The plaintiff asserts that when it became clear that the trial court was leaning toward giving the defendants' proposed jury instruction, the plaintiff made the conditional tender about which she now complains.  In her reply brief, the plaintiff argues that in offering the conditionally tendered jury instruction, she was acting in a proactive manner when the trial court ruled that it would give the long form of IPI Civil (1995) No. 12.05.  Accordingly, she "attempted to mitigate the damage by preparing a modified combination of 12.04 and 12.05. [But she] in no way waived her objection to 12.05 or the long form of 12.04 or 12.05."    

We find that the plaintiff cannot now distance herself from that conditionally tendered instruction, as the trial court issued the conditionally tendered jury instruction as the plaintiff requested.   

As the transcript makes clear, at the jury instruction conference the trial court did not determine whether to give IPI Civil (1995) No. 12.04 or IPI Civil (1995) No. 12.05, but instead reserved its ruling on the sole proximate cause instruction.  Instead of giving the trial court the opportunity to consider the matter, the plaintiff immediately presented a hybrid proposal and encouraged the trial court to accept the proffered jury instruction.  It was then, only after considering the three jury instructions proposed by the parties, that the trial court determined it would give the hybrid instruction as proposed by the plaintiff.  

The plaintiff has presented us with no authority that supports her position that proposing a modified combination of IPI Civil (1995) No. 12.04 and IPI Civil (1995) No. 12.05 to mitigate damage from the possible rejection of the use of IPI Civil (1995) No. 12.04 somehow precludes our finding that she waived her objection.  Moreover, we have found no such authority to exist.  As such, we find that the plaintiff has waived any claim of error regarding the trial court's decision to give the hybrid jury instruction, as tendered by the plaintiff.

A review of the hybrid instruction itself also fails to support the plaintiff's claim of error. "Each party has the right to have the jury clearly and fairly instructed upon each theory that was supported by the evidence."  
Nassar v. County of Cook
, 333 Ill. App. 3d 289, 297, 775 N.E.2d 154 (2002), citing 
Leonardi v. Loyola University of Chicago
, 168 Ill. 2d 83, 100, 658 N.E.2d 450 (1995).  It is within the trial court's discretion to determine what issues are raised by the evidence and whether an instruction should be given.  
Nassar
, 333 Ill. App. 3d at 297.  To determine the propriety of a tendered instruction, we consider whether the jury was fairly, fully, and comprehensively informed as to the relevant principles considering the instructions as a whole.  
Nassar
, 333 Ill. App. 3d at 297.  

The long form of IPI Civil (1995) No. 12.05 is appropriate "where there is evidence tending to show that the sole proximate cause of the occurrence was something other than the conduct of the defendant."  IPI Civil (1995) No. 12.05, Notes on Use, at 62.  If the jury was presented with some competent evidence tending to support the defendants' theory that Jonathon's malrotation caused the mid-gut volvulus requiring further operations, then the instruction was proper.  See 
Nassar
, 333 Ill. App. 3d at 297.  

As emphasized by the defendants, the plaintiff did not allege that Dr. Kennedy caused Jonathon's appendicitis, nor did the plaintiff allege that if Dr. Kennedy had diagnosed Jonathon's appendicitis on August 22, instead of on August 24, Jonathon would not have had to have any surgery.  Instead, the plaintiff's contention appears to be that Jonathon's condition following the removal of his appendix, and the subsequent surgeries he required, were caused by Dr. Kennedy's not diagnosing Jonathon's appendicitis in a timely manner.  The defendants maintain that Dr. Kennedy's diagnosis was proper and Jonathon's subsequent problems were caused solely by Jonathon's preexisting congenital malrotation.  The plaintiff's expert testified that Dr. Kennedy's delay in diagnosing Jonathon directly contributed to the development of the mid-gut volvulus.  The defendants and their expert testified that Jonathon had a malrotation not caused by Jonathon's appendicitis or by Dr. Kennedy's actions.  The defendants' expert also stated that a volvulus was something that happens because of a malrotation, but was unable to say for sure what caused Jonathon's mid-gut volvulus.  In this case, the defendants presented some competent evidence that the subsequent operations preformed to repair Jonathon's malrotation and mid-gut volvulus were necessary for reasons not associated with the action or inaction of Dr. Kennedy.  Therefore, we find that in giving the hybrid long form of the jury instruction the trial court did not abuse its discretion. 

II. Future Harm

The plaintiff additionally contends that the trial court erred when it refused to instruct the jury on Jonathon's increased risk of future harm as provided by the holding in 
Dillon v. Evanston Hospital
, 199 Ill. 2d 483, 771 N.E.2d 357 (2002).  The plaintiff acknowledges that generally errors concerning the extent of damages are not reversible where the jury finds the defendant was not liable.  But, the plaintiff argues, the error here was so "pervasive and prejudicial" that there is a likelihood it may have affected the jury's decision regarding liability.  In support of her contention that reversible error occurred here, she relies on general citations to 
Hall v. Dumitru
, 250 Ill. App. 3d 759, 620 N.E.2d 668 (1993), and 
Mulvey v. Illinois Bell Telephone Co.
, 53 Ill. 2d 591, 294 N.E.2d 689 (1973).  

In 
Mulvey
, the plaintiff contended that defense counsel's closing arguments, which pertained to the extent of damages, required reversal and a new trial.  
Mulvey
, 53 Ill. 2d at 599.  While noting that generally errors concerning the extent of damages are not reversible where the jury finds the defendant not liable, our supreme court in 
Mulvey
 recognized an exception where "errors which go to the question of damages may be so pervasive and prejudicial as to create the likelihood that they may have affected a jury's decision on the issue of liability."  
Mulvey
, 53 Ill. 2d at 599-600.  In examining the facts in 
Mulvey
, our supreme court concluded the claimed errors going to the question of damages were not so of such a nature as to have affected the jury's decision regarding liability.  
Mulvey
, 53 Ill. 2d at 599-600.  

In contrast, the 
Hall
 court was persuaded by the plaintiff's argument that the trial court error in allowing the defendant to argue that the plaintiff's failure to mitigate her damages by undergoing a second surgery may have affected the jury's decision on the issue of liability.  
Hall
, 250 Ill. App. 3d at 766.  The 
court specifically stated that 
Hall
 was a case where the claimed errors "which go to the question of damages [were] so pervasive and prejudicial as to create the likelihood that they may have affected [the] jury's decision on the issue of liability."  
Hall
, 250 Ill. App. 3d at 766.  In its analysis of the issue, the 
Hall
 court set out very clearly the plaintiff's arguments of the pervasive and prejudicial nature of the multiple references to the plaintiff's failure to undergo the second surgery to mitigate her damages
.

"Plaintiff argues that the admission of evidence of the medical recommendation that plaintiff undergo another tubal ligation shifted the jury's attention away from the separate question of defendant's liability.  Because of the emphasis on the proposed second ligation surgery, the jury might easily have begun to perceive the plaintiff as the wrongdoer.  Defendant argues that the admission of evidence of medical recommendations made to plaintiff could not have confused the jury.  We disagree.  It would not be unreasonable or surprising that a juror would take the duty improperly imposed on plaintiff to suffer the second ligation surgery and relate it directly to causation and fault.  It would not be unreasonable for a jury to believe that but for plaintiff's failure to have the second ligation surgery performed plaintiff would not have experienced the unwanted 1988 pregnancy or the ectopic pregnancy of 1990, thereby shifting the jury's attention away from the defendant's alleged malpractice.  We believe that this error with respect to damages was so pervasive and prejudicial as to have affected the jury's decision on liability."   
Hall
, 250 Ill. App. 3d at 766-67.    

Here, however, we are presented with no explicit argument setting out the claim of "pervasive and prejudicial" error based on the failure of the trial court to instruct the jury on the risk of future harm so as to have affected the jury's decision on liability.  We are presented with no argument how the jury might have been confused on the issue of liability based on the absence of a risk of future harm instruction.  Accordingly, we find no reason the general rule that errors concerning the extent of damages are not reversible where the jury finds the defendant not liable should not control the outcome here.  See 
Mulvey
, 53 Ill. 2d at 599 
(issue of damages never reached where the jury found the defendant not liable).  Because the jury found for the defendants on the issue of liability, any alleged error in failing to instruct on the risk of future harm to the plaintiff's minor is not grounds for reversal.

III. Undisclosed Opinion

Finally, the plaintiff asserts that the trial court abused its discretion by allowing Dr. Kennedy to present evidence not disclosed in his Rule 213 responses, and relies on 
Regala v. Rush North Shore Medical Center
, 323 Ill. App. 3d 579, 752 N.E.2d 443 (2001).  In 
Regala
, an expert physician called by the defendant stated in his deposition and on cross-examination at trial that the plaintiff's son would have been born without neurological damage if delivery had occurred earlier.  On redirect examination, the expert stated that the neurological damage would have occurred even if the child had been delivered earlier, expressing that opinion for the first time.  On appeal, a new trial was ordered because the expert's testimony was found inadmissible as he had exceeded his previously disclosed opinions.  
Regala
, 323 Ill. App. 3d at 585.  

"[T]he purpose of Rule 213 is to avoid surprise and permit litigants to ascertain and rely upon the opinions of experts retained by the opposing party."  
Scassifero v. Glaser
, 333 Ill. App. 3d 846, 860, 776 N.E.2d 859 (2002); see Official Reports Advance Sheet No. 8 (April 17, 2002), R. 213, Committee Comments, eff. July 1, 2002.  In relevant part, Rule 213(f)(3) provides:

"(3) 
Controlled Expert Witness
.  A 'controlled expert witness' is a person giving expert testimony who is the party, the party's current employee, or the party's retained expert.  For each controlled expert witness, the party must identify: (i) the subject matter on which the witness will testify; (ii) the conclusions and opinions of the witness and the bases therefor; (iii) the qualifications of the witness; and (iv) any reports prepared by the witness about the case."  Official Reports Advance Sheet No. 8 (April 17, 2002), R. 213(f)(3), eff. July 1, 2002. 

The defendants' supplemental Rule 213 disclosures, dated June 4, 2001, state: 

"Dr. Kennedy will testify consistently with his discovery deposition and medical records.  In particular, he will testify concerning his opinions disclosed in his discovery deposition concerning his care and treatment of Jonathon Brax as well as his opinions with respect to the standard of care and causation.  Dr. Kennedy will testify that he possessed and applied the knowledge and used the skill and care of a reasonably well-qualified surgeon in his treatment of Jonathon Brax.  Further, that he did not cause or contribute to cause any injury to Jonathon Brax."  

In his discovery deposition, Dr. Kennedy was asked, 
inter
 
alia
:

"[Plaintiff Attorney Burke]: Do you have an opinion Doctor, based upon your experience as to whether the CT study with contrast was a better diagnostic tool compared to the barium enema for appendicitis?

[Dr. Kennedy]: When?

[Plaintiff Attorney Burke]: All right, let's take both time periods, '95 and the present.

[Dr. Kennedy]: In 1995, no.  Certainly [we had] more experience with barium enema we [we]re very confident with barium enema at that time.  I think the literature is currently suggesting that the *** CT scan is a preferable study.

* * *

[Defense Attorney Collins]: Doctor, is it your opinion based upon a reasonable degree of medical certainty that the barium enema study you performed - that you had performed on Jonathon Brax in August of 1995 was a reasonable and appropriate test to work him up for a possible diagnosis of appendicitis?

[Dr. Kennedy]: Yes.

[Defense Attorney Collins]: Doctor, is it your opinion based upon a reasonable degree of medical certainty that you complied with the acceptable standard of care with regard to all of your care and treatment of Jonathon Brax?

[Dr. Kennedy]: Yes."

At trial, defense counsel elicited the following testimony from Dr. Kennedy: 

"[Defense Attorney Collins]: In 1995, was the CT scan a better test for the diagnosis of appendicitis than a lower GI?

[Dr. Kennedy]: That was not established at that time, no.

[Defense Attorney Collins]: Is there any reason to think if the CT scan had been done at that time that the findings would have been any different than they were for the lower GI that was actually done?

[Dr. Kennedy]: There's no reason to believe that.

[Plaintiff Attorney Lumb]: Objection, 213."

The plaintiff's reliance on 
Regala
 is misplaced.  "The admission of evidence in a trial is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion."  
Skubak v. Lutheran General Health Care Systems
, 339 Ill. App. 3d 30, 36, 790 N.E.2d 67 (2003).  An abuse of discretion exists where no reasonable person would agree with the position of the trial court.  
Skubak
, 339 Ill. App. 3d at 36.

Here, the record shows that during pretrial discovery, the defendants disclosed the general opinions that Dr. Kennedy would testify to.  More specifically, in his deposition, Dr. Kennedy testified that in 1995, a barium enema and a CT scan were considered equally acceptable methods for identifying appendicitis.  During his deposition Dr. Kennedy also agreed that when he examined Jonathon Brax in 1995, a barium enema was a reasonable and appropriate test to diagnose appendicitis, and he was acting within the standard of care in relying on the results of that test.  Although Dr. Kennedy was not specifically asked during his deposition whether, if the CT scan had been done in 1995, the findings as to Jonathon Brax would have been different than they were for the barium enema, the subject of a CT scan was raised during Dr. Kennedy's deposition.  We find that the particular question and answer complained of at trial were permissible as an elaboration on, or a logical corollary to, the originally revealed opinion.  See 
Skubak
, 339 Ill. App. 3d at 39; 
Scassifero
, 333 Ill. App. 3d at 860 (witnesses are allowed to elaborate or give logical corollaries to Rule 213 disclosures).  Thus, we find no abuse of discretion in the trial court's allowance of the testimony.   

CONCLUSION

For the foregoing reasons, the decision of the trial court is affirmed.

Affirmed.

WOLFSON and SOUTH, JJ., concur.   

FOOTNOTES
1: "Appendicitis" is defined as "inflammation of the vermiform appendix characterized by usu. right-sided abdominal pain and sometimes by nausea and vomiting."  Webster's Third New International Dictionary 104 (1986). 

2: "Gastroenteritis" is defined as the "inflamation of the lining membrane of the stomach and the intestines."  Webster's Third New International Dictionary 939 (1986). 

3: "GI" stands for "gastrointestinal."  Webster's Third New International Dictionary 955 (1986). 

4: "Cecum" is defined as "the blind pouch in which the large intestine begins and into which the ileum [the last division of the small intestine] opens from one side."  Webster's Third New International Dictionary 358, 1125 (1986). 

5: "CT" is an abbreviation for "
computed tomography
."  Stedman's Medical Dictionary 343 (24th ed. 1982).

6: "Malrotation" is "failure during embryonic development of normal rotation of all or any portion of the intestinal tract."  Stedman's Medical Dictionary 830 (24th ed. 1982).

7: "Volvulus" is "a twisting of the intestine causing obstruction."  Stedman's Medical Dictionary 1570 (24th ed. 1982).